Good morning, this is the matter of Reginald S. Lewis versus Commissioner Martin Horn and we have cross appeals filed in this matter at 06-9007 and 06-9008. Counsel, ready to proceed? Mr. Nolas. Good morning, Your Honors. May it please the Court, my name is Billy Nolas, along with Matthew Lowry, Maureen Rowley, and Mary Hansons, I'm appearing this morning on behalf of Mr. Lewis. What I propose, if it's acceptable to the panel, is to split my argument down the middle and in the first part discuss the Batson issue and why we believe an evidentiary hearing is appropriate on the Batson issue. And then in part two, which seems to make sense because we're the appellee, I also want to devote some substantial time to discussing why Judge Kaufman was correct in finding that this is a case involving dramatic, ineffective assistance of counsel at the capital penalty phase. But maybe the Commonwealth can make their presentation on that in between since they're the appellant in that regard. As to the Batson claim, as always, I know Your Honors review the briefs with great care and I won't do any preliminaries, I'll just cut to the chase. Mr. Lewis's case was tried in Philadelphia at a time where this court in Holloway, Brinson, Wilson, Hardcastle has already found that there was Batson error in cases prosecuted in the Philadelphia area during this time period. Was Batson preserved at trial? What shows the stricken juror's race or the panel's racial competition? It was preserved in trial. I think Your Honor is referring to the Abu Jamal decision and the issue of preservation in the trial court. And I can jump right to that or get to that in a moment. No, I took the question to ask what's in this trial record? Yes. Okay. Well, let me tell you what is in this trial record. What is in this trial record is a pattern, and this is part of our proffer, is a pattern of the prosecution striking every single African-American juror. But what is in the record to demonstrate, A, the race of the veneer, its composition? B, the race of the peremptory challenges? C, the race of any of the challenges for cause? Is there anything in the trial record that demonstrates race of any of those people? In the trial record, in the voir dire itself, you won't have that. What you do have is Mr. Lewis standing up during the course of the proceedings and complaining about prejudice. In fact, he says it twice. He says, how prejudiced? How prejudiced? And he says that after the sixth consecutive African-American juror is stricken. And in a moment, it's your turn. The record doesn't even show that the people who were stricken were African-Americans? The record itself does not show that. So how can you, you are assuming that that's what Mr. Lewis meant when he said, how prejudiced? How prejudiced? Well, in context, that's what he meant. And then we pled. Well, how do we know? There's nothing in the record to tell us what he meant. And then we pled, post-conviction, what the juror, who the jurors were, what their race were, what the strike rate was. You don't have any affidavits from the jurors, do you, as to their race? We have what is normally done in every habeas case. We've made a specific proffer in a habeas petition, verified by Mr. Lewis, based on our own investigation. But didn't Mr. Lewis also fail to factually develop this on direct appeal and also in the PCR proceeding? On direct appeal, Your Honor, direct appeal counsel, no bones about it, had a claim. No trial, not at direct appeal, not at the PCRA. Yes, at the PCRA. Yes, at the PCRA. And that's where I'm going. I'm going to the proffer that was made in the PCRA. But let me put it in context. Just let me have a minute, and then I'll come back to the Abu Jamal issue. On direct appeal, appellate counsel has a claim heading that says, defendant was denied his constitutional right to a fair trial by a jury of his peers. And then he raises a two-sentence claim that does not make any kind of proffer. That's the direct appeal submission by counsel. Counsel asks for a hearing, and the Pennsylvania Supreme Court says, that's insufficient for us to grant the hearing. We then become involved in the PCRA proceedings and then subsequently in the Federal Habeas Corpus proceedings. And what we did is we made a specific, detailed proffer as you said we did when? First at PCRA, then at PCRA. When in the PCRA? Myself and Mr. Dunham became, well, the PCRA. You got involved in the PCRA somewhat downstream during the course of the PCRA. Not at the time of the filing of the PCRA petition. PCRA counsel, Mr. Gerasi, filed a PCRA petition where he said there's bats in the air. Then there was a notice of intent to dismiss by Judge Sabo. The notice of intent to dismiss is you have not provided facts to support your allegation. We then responded to the notice of intent to dismiss. That's when we entered our appearance. And we identified the eight African-American jurors who are the same ones that were subsequently identified at the Pennsylvania Supreme Court and to Judge Kauffman and the District Court proceedings, the same ones that I want to get to in a moment here. We also submitted the Jack McMahon videotape to the state post-conviction court. That occurred at least four years after this trial. Sure. Sure. What we were saying is here are facts that we are proffering to show that discrimination And this case was not tried by Jack McMahon? No. Of course not. Is there anything in the record as to this specific assistant district attorney as to what practice that person used, typically used in selecting jurors? There was not a specific proffer as to Mr. McGovern, but there was a case-specific proffer in PCRA laid out in the PCRA appellate brief to the Pennsylvania Supreme Court and then subsequently to Judge Kauffman about what happened in this case. And that proffer included a strike rate of eight out of 12 strikes exercised by the district attorney against African-American jurors. We submitted that the exclusion rate was 100%, namely the Commonwealth struck every African-American juror that came up. We submitted that the jury was all white. I'm sorry. Time is passing, and I want to make sure you have adequate time to get to all of the issues, but most importantly, I think this panel is particularly concerned about the penalty phase. I understand that, but I urge you, let me have just two minutes. Well, as you've acknowledged, we do and have read the briefs. Yes. And as we all know, these matters are very extensive. Let me just say this. Do not lose track of what Abu Jamal really was about. Abu Jamal is not a case where this circuit created a procedural rule for Batson claims that requires that a specific proffer always be made at trial. The underpinning of Abu Jamal is a requirement that there's something provided to the trial court so that the trial judge would know that potentially discrimination is afoot. You know that because Abu Jamal cited Hardcastle, a case where there is no evidence from the actual voir dire and where the claim was raised for the first time post-verdict as an example of a case where things were properly preserved. Our submission is that there was plenty before Judge Sabo for him to see that this is a case where discrimination may be afoot, and you have that because you have an all-white jury, and you have Mr. Lewis on two separate occasions standing up and saying to Judge Sabo, this strike of what we then proffered post-conviction as an African-American person, this strike is prejudiced. He says that twice, and then he says that later, and he says that when an African-American woman whose cousin is a police officer is stricken, and then he says that when another African-American woman whose son is a guard at Gradoford is stricken. If you take the proffer that we've – You're persisting in arguing a record that I'm confident that this panel is well acquainted with. Yes, Your Honor. I thank Your Honors very much, and I do have quite a bit to say as to the penalty phase. All right. And I did not want to foreclose you from touching on your other two trial phase issues, if you want to do so. Those – the brief are proper on those, Your Honor. All right. Very well. Thank you. Your Honors, thank you very much. Mr. Goldman? Good morning, Your Honors. My name is Joshua Goldwert, and I represent the Commonwealth of Pennsylvania's official nominal party respondents, the appellees, and the cross appellants in this case. And with the Court's permission, I'd like to reserve two minutes for a rebuttal in support of the cross appeal. It's not usually our practice. All right. That's fine. Thank you, Your Honor. I'd like to say at the outset the suggestion that a state has to consent to an evidentiary hearing as the price it has to pay before it's afforded the privilege of being allowed to defend its judgments in the federal courts – or otherwise the federal courts have to assume that the petitioner's alleged or proffered facts are true, or at least true enough, and grant relief on the papers has no place in this or any other court's behaviorist jurisprudence. It's completely inconsistent with the principle that state court judgments are presumed to be valid, that counsel provided effective assistance, and that petitioners prove and not just offer to prove or allege that they are – Did the state court ever really say that Lewis didn't have brain damage or serious mental illness? Didn't they really say that he just gave no indication of that at trial? I believe that implicitly the state courts concluded that the proffers were inconsistent with what the state courts saw at trial, and I believe – But that is what they said. They just said he gave no indication of it at trial. Isn't that what they really said? I think that's what they said, but I do believe that implicitly the state courts concluded or found that the proffers were not credible and that they were difficult or impossible to reconcile with what the state courts saw at trial. And again, you have the state courts who had the opportunity to see the petitioner testify in his own defense. Does the record show that trial counsel did any sentencing investigation? Of the particular kind that is claimed by the petitioner that he didn't do? No, I don't believe there is, but of course the petitioner's argument, and I understand at least based on the facts – And wouldn't you concede if trial counsel never looked into Lewis' mental health or family background, wouldn't they be ineffective? I'm not sure I would concede that. First, because I think that under Strickland itself, you know, I'm not sure that would be considered a necessarily deficient performance. In Strickland, I think it's important to look at Strickland itself and to see  in terms of counsel's decision not to present this sort of mitigation evidence. And of course, Strickland was a capital case in which the defendant had pleaded guilty, so there was nothing else to prepare for but the penalty phase. Under Thomas v. Varner, the petitioner would have to show that there was no sans strategy to proceed the way counsel proceeded. What would you argue would be the sans strategy? I mean, one possible sans strategy would be we have no way of knowing, you know, whether the petitioner would have allowed this to have been investigated or presented. Well, that's not a strategy. That's an argument that the petitioner was in control of this defense as opposed to counsel. Well, I mean, one sans strategy, you know, could be that this particular petitioner in the context of this particular kind of case that presenting this sort of defense after putting on an unsuccessful alibi defense where this sort of mitigation case would be supported, you know, in large part by the same witnesses who testified in support of the alibi which the jury necessarily rejected and in support of other witnesses who apparently were or are serving long prison sentences, you know, would be very, very difficult, you know, for the jury to credit and might very well do, you know, more harm than good. And as we argued in our brief, you know, argument that says the Commonwealth failed to prove its aggravating factor, and there is a mitigating factor, his relatively young age at the time of the crime, that's something that's relatively innocuous and not subject to debate, whereas if you get into potential evidence that says, well, you know, he has antisocial personality disorder, which means he's a sociopath, and, you know, and which means. Wouldn't we really need a hearing on all this? Under our case, the recent case in this court, I think it's, what is it, Thomas v. Horn. I mean, it's fine to talk about all these possibilities, but shouldn't this really go back for a hearing on this, whether or not there was ineffectiveness? Judge Van Antwerpen? I realize counsel's dead, isn't he? He is, and I understand also that at least from the way that counsel's claim was litigated that counsel is making arguments in part based on what's in counsel's notes. So apparently there's, you know, apparently, we are talking about ineffectiveness claim, but there is at least some suggestion that opposing counsel has at least some access to what was in counsel's head at the time. Of course, there's no affidavit from Lewis himself, which, you know, which is, you know, interesting. You know, we're just told to assume based on what other people say that we're allowed this to have been presented, you know, at trial. But I think Judge Van Antwerpen will rest on the argument in our brief for why relief properly could have been denied, you know, without a hearing. But I believe that, that Thomas does stand for the proposition, if no other, that, yes, but you still have to prove it. You still have to prove your claim, and it's not sufficient to put forth pieces of paper, you know, with signatures whether or not allegedly under penalty of perjury saying, well, this is true, and therefore this was available, and therefore the fact that it wasn't presented demonstrates the counsel failed to search for it. Very, very briefly, I wanted to address one aspect with respect to one of the guilt phase claims that was raised in the, that was raised, although it wasn't addressed in the reply brief and wasn't addressed just now at argument, which was the Brady claim about the bus ticket. That, I believe, is properly viewed as a spoliation claim and not as a Brady claim. The Brady rule, as I understand it, governs evidence of which the defense was unaware at the time of trial. The petitioner was obviously aware of the alleged existence of the bus ticket and what it allegedly showed, and the suggestion that there was never any state hearing on this I think is also not accurate. There was a hearing. I mean, it was called the trial. I mean, there was testimony about the alleged bus ticket and what supposedly happened to it, and under the cases governing spoliation, Arizona versus Youngblood, Illinois versus Fisher, and the seventh story case, United States versus Lee, the question is whether the evidence, you know, was made scarce in order to undermine a valid defense because the police officer supposedly would have known that it was exculpatory, of which the jury obviously didn't believe that was so. And with regard to the – There's also testimony that the ticket stub had no information about date or place of trial. Well, I mean, which is correct, and I know that trial counsel tried to undermine that at argument, and there's a suggestion in the brief, well, yes, but his attempt to do so, you know, was ineffective. But this was the subject of testimony, you know, at trial, and obviously the jury didn't believe that. The jury obviously credited the police officer's testimony and did not credit the testimony that there was a bus ticket that supposedly showed that the petitioner was in San Diego or else he would not have been convicted. And, you know, with respect to the Batson claim, you know, I don't think I have much to add to what was argued in the brief. I think that the claim is clearly foreclosed by Abu Jamal. I think the idea that it was adequately preserved by an outburst or two outbursts by a representative pro se defendant is difficult to take seriously. And with respect to the suggestion that, well, the counsel was ineffective for not making a Batson objection, I don't think that's even been fairly raised as a claim, you know, in this appeal. You know, I think the claim is identified as claims on appeal. In this appeal, you know, there was a Batson violation, and to Abu Jamal, you know, the time to make your record, you know, with respect to a Batson claim is at trial. It is otherwise virtually impossible to get any sort of reliable adjudication of the claim. Have you ever conceded on the record that this was, in fact, an all-white jury? No. No, I do not believe we have Judge Fischer, and I don't, you know, and I don't have any particularly good reason to believe that's so. I mean, that's been alleged in a number of cases, you know, and at least some of the time it turns out not to be the case, but the position of opposing counsel seems to be, well, you know, we're entitled to allege it, we're saying it, and unless and until you can prove otherwise, the facts we allege are the facts. Prejudice, prejudice. I knew he would do that. We can't infer anything from that? I don't think so. Given the context in which it was made? You know, I don't think so, Judge Van Antwerpen, and I don't know of any state court or any federal court that adjudicates, you know, outbursts by a represented pro se defendant. I mean, the typical response by any court of which I'm aware when a represented pro se defendant has an outburst in court is either disregard or to instruct the defendant to, you know, to be quiet and to address the court other than testifying through counsel. As unfair as it may be, because Batson came after this case, the trial of many other cases your office was involved with, the existence of various decisions by this court of the presence of prejudice and jury selection during the era that this case was tried. Doesn't it lend credence to what is proffered by the petitioner here as to the position of the Commonwealth in this case? I don't believe so, and recognizing that it would be difficult to find counsel constitutionally ineffective for not raising a Batson objection before Batson was decided, although, of course, that's not an issue that's been identified. That's not been the rule on retroactivity, though. I mean, we've required that there be a prima facie showing of prejudice in Batson cases, but can't, I mean, what I understand the petitioner be trying to do is show that your office routinely struck, used peremptory challenges to strike black jurors during this period of time. And evidence about what supposedly happened in other cases has routinely, I believe, been rejected as irrelevant to what happens in a particular case, not probative and irrelevant to what happened in a particular case. We haven't routinely rejected it in looking at these Batson issues involving the Philadelphia DA's office, have we? Yes. We have? I mean, in cases where there's been no objection, you know, a trial? Well, let's say where there's been little more than the objection that was made here, the statement pro se by the defendant himself. Haven't we come pretty close to saying the pattern that was followed, unfortunately, isn't the pattern that's allowed in Batson? That's why I say it's unfortunate. I mean, the assistant DA's who were trying these cases in 1980 were following what they thought the law was, and they may have been following strategies to further that law. But Batson came along and said that's no good. And, again, even though Batson had yet to be decided, we know that objections, either Batson or Batson-type objections could have been and were raised even in these pre-Batson cases, and that wasn't done here. So that's how you distinguish this case? Among other ways. And, again, you know, again, I know that opposing counsel regards the rule in Abu Jamal as some sort of anomaly or an aberration, but, you know, I would refer this Court to, among others, like the Supreme Court's decision in the Puckett case just from this past term by the Supreme Court, you know, which the Supreme Court said there's no principle more familiar than that, than that failure to assert a right at the time when there's the opportunity to have the tribunal fix the alleged problem at the time. There's no principle more familiar than that you can forfeit the right by not timely raising it. And this is the kind of thing where I think, as the Court in Abu Jamal said, I mean, there's no reliable way of really proving these things after the fact. You know, and 25 years after the fact, I mean, the deck is very much stacked against us. I mean, if we say that, you know, 25 years later, the prosecutor says, I can't remember why we didn't strike this juror, well, the answer is, well, then the Commonwealth fails under Step 2 of the McDonnell-Douglas burden shifting test. And if their response is, well, actually, I do remember why I struck this juror, and the response is, well, that's absurd. Who on earth could remember why you struck a juror 25 years ago? That's not credible, and so you lose at Step 3 of McDonnell-Douglas. I mean, this is not a game that the Commonwealth can plausibly, you know, win 25 years after the fact, I mean, in the sense that there is any chance of a reliable adjudication of the claim, and that's why cases like McCrory and now in this circuit of Abu Jamal say that it's not fair and it's not reasonable to expect the Commonwealth to play 25 years after the fact. Let me make sure I understand your position on the ineffective assistance of counsel at the penalty phase. Are you saying that in light of the decision in Thomas v. Horn that this should be sent back for a hearing? Our position is that the state court's findings of fact, including by what the state courts were able to observe in the state court's conclusions of law, can't be swept away that easily, and so we adhere to the position in our brief  If the court does not accept that, then in conformity with Thomas So you're not conceding that this has to go back for a hearing? We are not conceding this goes back for a hearing, and our position is further that if the court does determine that this goes back on remand, it should not be a remand limited just to whether there was an investigation of these facts that are alleged to have been facts. I mean, there are additional questions as well going both to the performance and the prejudice component, such as whether the alleged facts actually are facts, how reliable is the expert opinion? You may not be conceding it, but I was left with the distinct impression when I read the briefs that you had at least shifted focus, if my recollection serves me correctly, and it's been some weeks since I read the briefs. The prospect of a hearing on remand was relegated to a footnote at the end or toward the end of your brief. By the time I got to reading the step four brief, it seemed to me there was considerable discussion over the prospect of evidentiary hearing. Well, I think in response to the third step brief, again, while we're not All right, so that's all it was. It was merely a response and it was not a shift in focus. Well, yes. In response to the third step brief where one of the arguments raised by opposing counsel was that it's entirely proper in this circuit to just grant relief based on the papers, based on assertions on pieces of paper. And to me, that was a very, very important point to address. Thank you, Your Honors. Thank you. Mr. Nolis, when we had asked you to move on earlier, I was under the impression that you were going to get to the ineffectiveness alibi and self-defense issue and then to the Brady issue as well, and time was marching on. I may have misunderstood that, Your Honor. You didn't intend to do that, so please feel free to use as much time to continue on the Brady issue as you wish. Yes, Your Honor. I just, I really feel that I need to say I mean on the Batson issue. Yes, let me just, yes, I do need to say a couple of additional things about Batson. In Holloway, in Wilson, in Brinson, in Holloway, Judge Van Antwerpen, you were the district judge and you granted us a hearing and there was no trial objection. And the proffer was made post-conviction the same way it was made here. It was made by my office. We presented the strike rate. We presented the exclusion rate. Less of an exclusion rate than what was presented in this case. We presented the historical evidence about the district attorney's office and, Your Honor, said a hearing should be held and ultimately the Court of Appeals granted relief. There was no trial objection in Wilson. There was no trial objection in Brinson. There was no trial objection in Hardcastle. Abu Jamal did break new ground in this circuit by saying that one aspect of a Batson claim is that there should be something before the trial court at the time of the trial proceedings. But Abu Jamal did not say that that's a procedural rule necessary to preserve the claim. Abu Jamal did not hold that there's a specific type of objection that a lawyer needs to make to preserve the Batson claim because he couldn't hold that. That's a state procedural issue. What Abu Jamal held was that there should be something before the trial court signaling the trial judge that discrimination may be afoot. And here you have that. You have Mr. Lewis standing up and the transcript says, looking at the district attorney and saying, how prejudiced, how prejudiced after what we have submitted, the sixth consecutive African-American juror is stricken, a woman whose cousin is a police officer in Philadelphia. Interestingly, the very next juror is somebody that is a hardship case and the first white juror that's stricken by the prosecutor happens right after that. It's the very next one. The only time the prosecutor starts striking white jurors is after Mr. Lewis stands up and puts prejudice on the record. That's what Judge Sabo sees. That's what's before the trial court in this case. And the white jurors who are stricken, we've given you a comparison of that in our proffer. The white jurors who are stricken, three of them are unsure on the death penalty. One of them, his sister was prosecuted by the Philadelphia district attorney's office in a homicide case involving a knife. Later, the next two African-American jurors who come up are stricken by the prosecutor. This is our proffer. And when the last one, Mrs. Harvey, is stricken, Mr. Lewis stands up and says to Judge Sabo, I knew he would do that, referring to the prosecutor. So in all candor, if you intended, if the Abu-Jamal panel intended to have a specific contemporaneous objection rule, a rule by which a defense counsel has to stand up and make the kind of proffer that we have made post-conviction in this case, you're not going to find that in this voir dire. But if this panel reads Abu-Jamal to mean what I think it actually intends, because I can't believe that the majority in Abu-Jamal intended more than to say something should be there before the state trial judge, signaling that there might be discrimination so that the trial judge can then make some kind of inquiry. Well, the defendant himself standing up in this pattern and saying how prejudiced, how prejudiced, saying I knew he would do that, referring directly to the prosecutor, puts that on the record. So that given that that is on the record. As a matter of federal constitutional law, it doesn't matter that his lawyer didn't say it, because in Ford v. Georgia, the United States Supreme Court didn't think it mattered whether the lawyer said it or not, in a timely objection-style fashion. What matters is that what you have to look at what the trial judge had before him. And if you, in the shoes of the trial judge, say, you know, this trial judge had some grounds here upon which to make an inquiry, then you turn and you look at our post-conviction proffer. And our proffer, we submit, is sufficient for a hearing to be held. Let me turn to the ineffectiveness claim in that regard. And then I'll try to sort of hit the big picture. The big picture is the State Supreme Court had the exact same proffer, the exact same evidence that we've presented, first to Judge Kaufman and now to you, as to Mr. Lewis's history of unbelievable child abuse. I mean, this man was tortured. There's no question about that. The Pennsylvania Supreme Court said nothing, not a word, not a finding, nothing. Just like Mr. Lewis has never given us a word about it either, has he? Mr. Lewis, there's a question about Mr. Lewis himself. There's no duty on the defendant to submit an affidavit. The issue is, you know, is this defendant someone who is hesitant in terms of presenting evidence at the penalty phase? He testified. But that's one of the inherent problems in this case. But counsel called him. Counsel called him and didn't ask him about his history. Counsel asked him about his prior convictions. Testified at both stages. Testified at both stages. And counsel limited the questions to questions about his prior conviction and opened the door to harmful facts about that prior conviction. Mr. Lewis. What concerns me, though, you're talking about affidavits and evidence that was submitted in the PCRA 14 years after this trial. That was true in Wiggins. That was true in Williams. That was true in Ron Pillow. That's true in every single in effect in this case. You have to hear me out here. 14 years after this trial. But the issue here is whether or not based on what defense counsel knew when he was trying this case, whether or not he should have investigated Mr. Lewis's background to determine whether or not additional mitigation should have been put before the jury. Now, what relevance is it as to what you presented to a PCRA court 14 years later? With all due respect, Judge Fischer, that's not the issue. Why isn't that the issue? The issue in this case, as in Ron Pillow at the Supreme Court, Williams at the Supreme Court, Wiggins at the Supreme Court, Thomas most recently and several other cases in this court, is the reasonableness of counsel's investigation. And the Supreme Court has held that a capital defense counsel has a duty to conduct a thorough investigation of the defendant's life history in a capital case regardless of whether the defendant volunteers that information or not. That's a freestanding view. But don't you have to show there was no sans strategy for the strategy that was pursued? No, we don't. No? But in this case, we have. In this case, what counsel did is he presented nothing, zero in mitigation. Well, that's not true. He argued that the offenses, the prior convictions, were not as serious as they purported to be on the record and that the defendant was a man of youth at the time those acts were committed. Now, why wasn't that a sans strategy? Particularly when you had a case here where it was I didn't do it because I wasn't there, defense. And why wasn't that a sans strategy? The direct answer to Your Honor's question is that that's not a sans strategy because that's the position of the dissenting justices in Rompilla. And the Supreme Court has held that the question in these cases is the reasonableness of the underlying investigation that leads to the strategy. You can't have a strategy unless you first have a reasonable investigation. But the record here does not show whether there was or wasn't any investigation. And our prong for it. And doesn't Thomas V. Varner say that the no sans strategy prong has to be established by you? And we've established that. We've submitted that counsel did not. No sans strategy. We've submitted that. As to the investigation, counsel did not get a mental health. Are you positing that it is not a sound strategy for defense counsel rather than going forward with the presentation of evidence of an emotional or psychological history, the evidence supporting which may cut both ways, but instead to undermine the aggravating circumstances which must necessarily be weighed in the penalty phase? That is a strategic decision that can be made, but only after there is a sufficient investigation. Doesn't this record suggest at least as a possibility, as a supportable and supported possibility in this record that that's what occurred? Well, if the court is thinking that, then we should have an evidentiary hearing. I mean, it was supported through Mr. Lewis's own testimony. He's the one who tried to minimize the shooting event in New Jersey. In response to questions. But look at what you have in this record as well. You have no mental health expert is requested. You have no mitigation investigator is requested. Does the record show that? Sure. It's a court-appointed case. If you're going to have a mental health expert, you're going to have a motion for such an expert. You don't have such a motion in this record. And do you argue in the PCRA court that the record is void of any of those? We argued in the PCRA court that there was no mitigation investigation. That was a fact that was taken on in Thomas v. Horn. I don't remember you arguing that in this case, in the Lewis case. We did. We submitted that there was no mitigation investigation. There was no expert that was requested. This proffer is the same as Thomas plus. And the plus here is that you have affidavits from all of Mr. Lewis's family members who were present at the trial and from friends who say that counsel never interviewed them. Counsel never asked them any questions about Mr. Lewis's life history. And then they detail Mr. Lewis's life history. You didn't have that in Thomas. In Thomas it was and there were questions about the degree of counsel's investigation and therefore your honors remanded for hearing in Thomas as to the deficient representation. Here you have everything that was proffered in Thomas in the sense that the proffer is there was no mental health expert. There was no mitigation investigation. And counsel proceeded into the penalty phase without a sufficient body of information upon which to make strategic decisions. Or as the Supreme Court said in Wiggins, with a rudimentary knowledge based on a narrow set of sources. Remember this is a lawyer who himself says at the penalty phase to Judge Szabo, I'm sorry, I haven't gone through this before when there's some confusion. And you argue that the record shows that there was no. Because I see the record as showing nothing one way or another. The record does not show that there was the thorough investigation that the Supreme Court has looked for in Wiggins. They've looked for it. Has said counsel needs to do. And so that's what you have on this record is you have a lawyer who proceeds to the penalty phase. We have submitted without that thorough investigation. And on top of it you have a lawyer who provides no independent mitigating evidence to the jury in a case where Pennsylvania law will require death if the jury finds an aggravator and no mitigation. Did the reference several times to age not some, albeit very small, but some mitigating evidence? Counsel does not argue for age to be found as a mitigating factor. Counsel says consider that he was young at the time of the priors. But the court instructs as they're required to do. Sure. They instruct on the mitigating circumstances. Sure. The court does. And the court instructs on extreme emotional disturbance as well. And there was no evidence in that regard. But saying to the jury consider that he was young at the time of the priors is not a reasonable strategy in a case where you have this degree of mental health evidence and this degree of life history mitigation evidence. See, this is my problem. You want to argue based on 14 years after the trial that there was a record of mental health evidence. But I look at this record as showing that there is no record of mental health evidence. And to the contrary, there is Lewis's conduct throughout the course of this trial which may show some grandiosity and some egotistical behavior that doesn't appear to show any mental illness. And, Judge Fischer, the way to the extent that you're hesitating, the way to resolve it one way or the other is to have an evidentiary hearing. And we have no hesitancy on an evidentiary hearing. We've always asked for one. Surely this proffer is sufficient to require an evidentiary hearing. What I'm suggesting to you, however, is that Judge Kaufman was right that on this record relief is appropriate. A district judge can grant relief, deny relief, or grant a hearing in any civil case. In this case, relief is appropriate without a hearing because when you talk about a mental health proffer, the Commonwealth has objected to Dr. Berlin, the defense mental health practitioner. But Dr. Canals, who works for the court and who evaluated Mr. Lewis on behalf of the disorder, found that he suffers from paranoid personality disorder, explosive disorder, hypomanic disorder, and a history of substance abuse consistent with the history that is family related. He also wrote a book. I'm sorry, what? He also wrote a book. He also wrote a book. He also describes that Mr. Lewis has a history of hospitalization and psychotropic medication predating this trial. This is their doctor, Dr. Canals. If you turn to the Pennsylvania Supreme Court appellate brief we presented on the appeal, you go to page two after the heading, the very first thing we told the Pennsylvania Supreme Court about was Dr. Canals, the Commonwealth's own court evaluator who found bipolar, hypomanic, paranoid, explosive, and antisocial personality disorders, history of substance abuse, a history of hospitalization predating the trial. Mr. Lewis's mental health problems are so significant that less than a year after the death sentence in this case, he's sent by the Department of Corrections, and this is part of our proffer, sent by the Department of Corrections for neuropsychological testing. And Judge Fisher, you know these cases. The Department of Corrections does not say an inmate is so bad that he needs a neuropsychological better. Wasn't that after the next incident that he was sent? No, that's while he's in DOC custody a year after the sentence in this case. Yeah, but wasn't he sent after the stabbing, the subsequent stabbing in the prison? That was Dr. Canals. That's the one I just talked about a moment ago. But the next one, Dr. Wellman, he works for the Department of Corrections. He's their psychologist. And they said Mr. Lewis needs a neuropsychological battery because the DOC staff is seeing something, and he gives him a neuropsychological battery. And he, the Commonwealth's employee, forget Dr. Berland, says Mr. Lewis has organic brain damage, organic brain damage consistent with a childhood head injury. He doesn't have the history. He doesn't have the affidavits. He doesn't know the mother and the sisters and the siblings account about the father taking him and cracking his head against the bathtub when he was three years old because he was keeping the drunk father up all night. He doesn't know the history of the father coming in, and Mr. Lewis is trying to protect his mother from abuse, and the father, again, cracks his head against the side of the table. Not knowing any of that, he, working for DOC, within a year of this death sentence, says organic brain damage based on a preexisting childhood head injury. He also says – Mr. Nolas, I would like, because your response here has been rather lengthy, and it's been some time since I asked you this, but to return to the no evidence of mitigating circumstances issue, I immediately turned to the record because I've read the record, and I thought I remembered something in addition to what you correctly point to as referenced by Attorney Gershenfeld to the age of Mr. Lewis when the other two offenses were committed. But he says more than that. He also says in his opening statement to the jury, I respectfully submit that the evidence you will hear, taking into consideration what the law says, what the law says under mitigating circumstances, it says the mitigating circumstances shall include the following, the age of the defendant at the time of the crime. It's a reference to the statute. He's clearly not talking about the prior two offenses. Well, then I didn't remember that in the opening, Your Honor, but what evidence does he present of that? Well, I – I mean – Excuse me. I'm sorry. Yes, sir. I apologize. I've read the record, and it's – not all of the trial record, but a good – but a substantial portion of it. I will concede that I think that the presentation by defense counsel was abysmally brief. It is hard for me to imagine, frankly, under any circumstances, arguing for someone's life and not speaking at greater length and with more passion than jumps off of these pages. But for purposes of this argument, you said at least once that there was no evidence of mitigating circumstances, and I simply felt it was very important that we be completely accurate. I – Because that's not – Obviously, I misspoke in that regard, and Your Honor has corrected it, but there was no evidence of mitigating circumstances. That's right. Counsel doesn't present a single witness to even establish age. I agree with that. Doesn't establish his age. What's the jury going to do with that? And so there's one – granted, there's that passing reference that I forgot. Doesn't – zero mitigating factors, and the jury finds mitigating factors. And, Judge Fischer, I was going through this because I don't want you to have the impression that the mental health evidence in this case is the way the Pennsylvania Supreme Court looked at it, with simply a focus at Mr. Lewis can speak well, and therefore he showed no sign of brain damage, and therefore, ipso facto, there must be no mental health evidence. When the Commonwealth's own evaluator and the Commonwealth's own DOC psychologist say the man has organic brain damage, bipolar disorder, hypomanic disorder, those are serious mental illnesses. Well, but, again, there's more, more, much more in this record than simply that the man speaks well. There is, again, jumping off the page, a defendant who is very, very engaged in his own defense in numerous ways, to the extent that you even turned it to your own advantage by suggesting that his suggestion of prejudice articulated pro se as a basis to consider as Batson. Sure. So, sure. But I – Mr. Lewis was very engaged. Sure. But I cannot imagine that the fact that a defendant is articulate and verbal and is trying to protect himself somehow negates his right to have his life history and his mental health evidence. Again, I'm merely indicating that I think your minimization of the Supreme Court's noting, as you put it, that he speaks well, is not all that's here. It's not all that the Supreme Court of Pennsylvania would have seen. They're onward. It's not all that any of us who have looked at this record have seen. He was active in his defense. They're onward. He was active in his defense. He was found competent. He asserted his rights. That does not negate his right to have a full and fair capital penalty phase under the Eighth Amendment. And the point being, on this record, there is no debate as to the fact that this representation was deficient. So if you consider remanding for a hearing, I would suggest – one last suggestion and then I'll sit down. This is kind of the flip side of Thomas. In Thomas, the life history and mental health evidence was so utterly clear that there was no need for a hearing on prejudice. And Judge Smith, you and the other panel members had a question about deficient performance. Did Mr. Thomas really want the mitigation and, therefore, you remanded for a hearing on deficiency? Is that statement by the state court about his mental health at the time of trial, is that something that is entitled to deference to the extent that it says something? Sure. He's competent. We have never disputed that he's competent. As Judge Smith said, we've actually used his own participation in his favor as to the – We do have to give deference to that as far as that goes. Absolutely. Absolutely. And Dr. Berlin, the defense mental health expert, makes the same findings, that he's competent and that he can articulate and that he can assert his own rights. He doesn't have verbal problems. The Department of Corrections psychologist who found that he's got organic brain damage himself said he doesn't have problems verbally. He can speak. He can articulate. He can assert what he's thinking. His problems are bipolar. And your honors know what a bipolar disorder is. It means that he goes from a manic phase to a down phase. How about the fact that your client denied any childhood abuse? Where does that get you? That's the same as Mr. Rompilla, the same as Mr. Wiggins, the same as Mr. Williams at The defense counsel has the duty to conduct that thorough investigation. And let me make the suggestion under Thomas. As far as strategy at the time of trial, is what you're saying, look, you can choose a strategy, but you've got to look into this mental health issue thoroughly into his childhood and his background before you make that choice. Is that what you're saying here? Yes, your honor. Yes. And then my suggestion under Thomas is in Thomas there was a sufficient debate so that a hearing was needed as to deficient performance. My suggestion to your honors is if you're going to order a hearing here, the real debate between the parties is the Commonwealth has attacked Dr. Berland and we've submitted that Dr. Canals and Dr. Wellman are in our favor. Maybe a hearing on prejudice and maybe a – Unfortunately, the most important person can't really – well, I shouldn't say the most important, but one of the important witnesses can't be at the hearing. No, but that's what I'm saying. As to deficient performance, I think the record is pretty clear from the dearth of representation originally that that's not – it was not a case of effective representation. And so the issue is can we establish prejudice? Certainly I think we can and we already have. This case has to go back anyway for a resolution of some other issues that the district court did not resolve, doesn't it? Not if your honors affirm us to the penalty phase. I understand. And I think it should go back for a Batson hearing as well, but we'll leave that aside for the moment. I was merely trying to remind myself and ask you to confirm there are some other issues that were not resolved. If we affirmed Judge Kaufman's decision on the penalty phase, this could go back for a new sentencing hearing, could it not? Correct, Your Honor. And then that's – that would be the next step. Yeah. Your honors, I have a lot more, but I think I've said maybe enough. As always, vigorously and well-argued. Thank you. Your honors, thank you very much. Good night. And I believe some brief, sir, rebuttal or whatever we call it when we get to the fourth stage. Mr. Goldwater. Thank you, your honors. Let me say first and briefly, this case is a textbook example of why we don't grant relief based on proffers. If we just took the facts proffered by the petitioner as not only true but the complete universe of facts that there are, we would never – we would not know that Mr. Lewis is writing books, not just this one but several others, selling them on Amazon and other websites, has apparently some fan following from prison, and we wouldn't know about his role as the avowed mastermind or co-mastermind of the great Philadelphia prison break of 1984, you know, when he broke out of prison. I mean, he's painted in the proffers and the expert report as somebody who's hopefully delusional. He did not hallucinate those prison bars and that prison window away. That prison break actually happened. And so the suggestion that he – well, he has verbal skills. Well, he actually has practical problem-solving skills as well, too. And that was – you know, that wasn't something that happened.  define a problem. It did, and it's my understanding that was actually a complex criminal conspiracy to bribe corrupt prison guards with the proceeds of drug sales inside the prison. And he and another inmate, I understand, escaped and the petitioner absconded to Buffalo where he was apprehended a couple of weeks later. But he did not hallucinate that window out, and he did not hallucinate those prison bars away, and he didn't hallucinate those special steel-cutting blades into the prison. And as far as the facts that have supposedly been proven, I don't think anything has been proven yet. Certainly not as to deficient performance and not as to prejudice either. You know, we just have, you know, the kind of expert report that is, in terms of the expert's methodology, I think is completely impenetrable. He says that based on the fact that he denies certain symptoms, I assume not only that he's not faking but that he has some of the symptoms that he denies having, which I don't think I understand at all. And as far as Dr. Wellman's report goes, well, I mean, it seems that we probably know something at this point that Dr. Wellman didn't know, that at the time Dr. Wellman's reported, that's probably around the time that the petitioner was planning his escape from prison. I would submit that most people would probably seem, you know, paranoid and probably in need of some sort of medication as they're planning, you know, to break out of prison, which we know he did several months later. Thank you very much, Your Honors. Thank you. Thank you. Thank you very much, counsel. The case has been very well argued, very well briefed, as always. We thank you both and we'll take the matter under advisement.  Thank you, Your Honors. Thank you, Your Honors. Thank you. Thank you. Thank you.